May it please the Court, good morning, Your Honors. I'm Mark Reichel on behalf of Mr. Watters. As set forth in the briefs, I believe initially the indictment should have been dismissed because it was brought on information which was illegally obtained, and as his attorney during the trial, I did not raise it at the trial because I did not find it out until the individual was testifying at the trial. That was the first time I had been made aware that he was working as an undercover informant in my client's defense camp. In fact, he had secured the attorney for my client. My client was living with him, and his instructions from the FBI, the informant's instructions were to go in there and come back and report everything that you're hearing. At trial, it established that he had actually been interviewed by defense investigators, that he had been kind of privy to the defense issues and so forth, and during my client's original indictment, my client thereafter fabricated a document, a receipt for cars, which he gave to his attorney, his attorney gave to the prosecutor. My client was then subject to a superseding indictment which alleged this false statement, this obstruction of justice charge. There was an informant for the United States Attorney's Office who was a paid informant who was part and parcel of all of that, not part and parcel of making it, but he was present during it. He was present during the planning, the preparation, the making of it. He was basically present during the commission of the crime and reporting. It doesn't matter that there are no factual disputes in this case. It's pretty clear what happened, isn't it? There is no factual dispute, Your Honor. Yes, about what happened. I don't think there is any factual dispute, Your Honor, about what happened. There may be from the government. All right. So when we review it, what do we do so far as you're concerned? As far as I'm concerned, Your Honor, that you need to vacate the conviction because the indictment should not have stood, should not have been granted. And if this Court allows it, I think it is a wholesale violation of the Fifth Amendment and the Due Process Clause. The cases I cite, starting with Messiah, beginning with Messiah, all the way through to the other cases cited in my pleadings from the Ninth Circuit and from the Supreme Court, are violated by this conduct. And I think that to me it's very clear that the indictment should be dismissed and the prosecution dismissed for good based on this misconduct. It was not raised at the new trial motion. Now, okay. Mr. Connolly, I thought you were alleging that this was a violation of his Sixth Amendment rights. I'm sorry, Your Honor. It is his Sixth Amendment right, as well as the Fifth Amendment. Okay. Because Mr. Starr was privy to privileged information? Yes. Attorney-client information? Yes, Your Honor. What information was he privy to? Well, he was privy to the information that Mr. Starr was privy to. What they needed to do for the defense, he was charged with stolen automobiles. They needed to locate him. Right. But what did he know about your communications with your client? At the time, Your Honor, it was not me. I actually came in after this. Okay. Well, with trial counsel. Well, I was the trial counsel. But Mr. Waters was originally indicted for stolen vehicles. Okay. This was with Mr. Axup, right? Yes, Your Honor. Okay. All right. So what did Mr. Starr know about communications between Mr. Waters and Mr. Axup? I believe he knew about the communications by Mr. Axup that you needed to, Mr. Waters needed to find receipts for these vehicles. All right. Why would that be privileged? It was part of the defense strategy. It was part of the entire defense strategy. Right. And of course, Mr. Waters was making it all up. He was lying about everything. Well. What makes that privileged? He was only, Your Honor, lying about this one receipt. Right. Well, the one receipt turned out to be critical, though. Yes. There were other receipts, though. It was very clear. And Mr. Axup testified in the evidence at trial was that Mr. Waters did have receipts for other vehicles. He had all sorts of paperwork for the other vehicles in the indictment. But these specific, I believe it was eight cars, he did not have a receipt for. And he went about to manufacture with another individual. This receipt is what the evidence was at trial. So what information is privileged? I believe all of that, Your Honor. I don't think there are any communications by his attorney about the subject matter of the representation, about the defense, and about how they planned to defend the case. What about the crime-fraud exception? The crime-fraud exception as to the attorney-client privilege, I believe, was also not appropriately applied by the district court in this case, because based on the Bower opinion from this circuit, the attorney-client privilege is so sacrosanct that there has to be more evidence. How about Chen? How would you distinguish Chen? Your Honor, I don't have an answer to how I would distinguish Chen right now. I would rely on Bower. To me, Bower was clearly, clearly sets forth the rules and it was violated. Insomuch as Bower had a bankruptcy attorney who told him to fill out the paperwork properly, Mr. Axe told Mr. Waters to, you know, get a receipt, but obviously he implied to get it lawfully. Obviously? Well, Mr. Axe testified, and I don't believe there was any testimony or evidence or a hint that Mr. Axe had told him just, you know, to fabricate anything. But, by the way, Mr. Axe did tell him, I don't care if you have to pay for it, you need to get receipts for these. If you have to pay somebody to go find the receipt, we need these receipts. He testified to that. So my point would be that insomuch as Bower had a bankruptcy attorney who testified that Mr. Bowers was to fill out his forms truthfully, and then they were not truthful, they were able to convict Mr. Bower, this circuit struck that conviction. Mr. Axe coming in and saying, I told him we needed receipts, I told him to get receipts, I told him this, that, and the other thing about receipts, he then provided them to me, Mr. Waters told me how he was going about doing it, how he was having problems finding somebody to get the receipt, and then Mr. Axe testifying he gave it to the United States, I think is exactly the same as Bower. And I apologize, I can't distinguish Chen. Perhaps with my reserved time when I come back, I will briefly look at it, but I think it's a clear violation of Bower. And so the conviction only stands based on the testimony of Mr. Axe. And if we strike his testimony, the conviction must be stricken as well. Additionally, you know, I've raised several issues in my brief, but I would note that for sentencing purposes, the district court made two statements which I think are not in accord with Ninth Circuit authority. He stated he just doesn't see any way someone can go to trial and still be allowed an acceptance of responsibility reduction under the guidelines, and he cited the guidelines section. He recited the law from the defense counsel, which was me, and he said in essence he just didn't think that that applied, and he didn't feel that someone could go to trial. Where did he accept responsibility? He had a very extensive letter and allocation to the court where he said Unfortunately, he did it at sentencing. And we've been very clear in our law that it's too late. Well, if that is the Ninth Circuit authority, then it's too late. But he was very clear with his contrition and his acceptance of responsibility. He explained it. After he was convicted. It was after he was convicted, Your Honor. That is correct. He didn't take the stand at trial to testify. It consisted solely on that issue of me cross-examining the two government witnesses on the issue, which were Mr. Starr, who was this, you know, we believe an agent, and his former attorney, who we felt shouldn't have been able to testify. Filed a motion pretrial to prevent the attorney from testifying. Pleading guilty would have we would have lost that right. We would have lost that issue. So one of the reasons we went to trial was to preserve the issue of whether or not an attorney, a prior attorney, can testify. We thought Bower had been violated. Additionally, I think the Court was in error, in very clearly in error, in not allowing a review of Mr. Axe's testimony. It was 18 pages, and I think it lasted 15 minutes. Would you turn to the question of the instructional error? Yes. I believe that the instruction that was given was from the Ninth Circuit manual model of jury instructions about corruptly, and corruptly is defined there as evil and wicked intent. The Ryan case is from 1969. It's still cited in the Ninth Circuit manual in the model jury instruction for that charge. And I think the district court confused that with knowingly and struck evil, wicked intent in exchange. Your view, as I understand it, is they should have left evil out, and you rely upon the Arthur Anderson case. So I went back to read the language of Chief Justice Rehnquist, and I don't – I have difficulty following your argument. Where that evil came in was when he cited Black's Dictionary and Webster's and et cetera. But then when he made the application, he says only persons conscious of wrongdoing can be said to knowingly, corruptly persuade, and limiting criminality to persuaders conscious of their wrongdoing sensibly allows Section 1512b to reach only those on the level of culpability. And that's the very language that we got in the jury instruction. The evil part was part of the definition part. So I'm having difficulties seeing how the Supreme Court decision would call for anything other than the jury instruction given. I understand, Your Honor. Just one correction. I did seek evil, and I sought evil to be put into the jury instruction. And the reason I did so was because the Ryan opinion from the Ninth Circuit, which was annotated to the manual – to the Ninth Circuit model of jury instructions stated that. And I think Arthur Anderson – I do know that in Arthur Anderson they cited the Black's Law Dictionary and cited that – that they cited that a definition of corruptly would always include in the footnote. Well, except that then – except that then the – as Judge Wallace has pointed out, the Supreme Court then said that corruptly must reflect some consciousness of wrongdoing. And that's the phrase they used, precisely the phrase the judge put in here. That's correct. So the wrongdoing evidently incorporates evil intent or wicked – or wicked intent. That is correct. However, I think that evil and – I don't see any – and I don't see any court after Arthur Anderson that has adopted your construction of this. I understand, Your Honor. And I'll submit it on that. Okay. I have a little over four minutes left. I think I – if I may – if I may reserve that for rebuttal. Certainly. Let's hear from the government. Good morning, Your Honors. My name is Steve Lapham. I was the Assistant U.S. Attorney who handled all the proceedings in the district court. I'd like to start by addressing the Sixth Amendment claim. That seems to be the claim that is most prominent in the appeal and which concerns the court the most. And, of course, you know that the government's argument there is that the argument has been waived, should not be considered by the court, or if considered by the court, only for plain error. There are consequences to the fact that this case, this argument wasn't raised in the district court. One of that – one of those consequences is that if this case or this argument had that much substance, you would have thought that it would have been a centerpiece of a motion for new trial or highlighted in the defendant's motion for bail pending appeal when he highlighted what issues he intended to raise before this Court. The other consequence is that there was no opportunity here to make a record on this issue. Had the defendant raised the argument in the district court, the district judge and the prosecution could have heard evidence regarding the substance of the claim, but that didn't happen. And as a result of that, the defendant now characterizes, both in his brief and in his argument before this Court, makes certain characterizations about Jesse Starr that are simply not supported by the record. He continues to call Mr. Starr a paid informant of the government. The only evidence in the record is that Jesse Starr was relocated shortly before trial, and the government paid for those relocation expenses, and that was based on concerns about his safety as he was about to be revealed as someone who was going to testify against Mr. Waters. The defendant also continues to characterize this situation as he was surprised by Jesse Starr as a witness. He continues to say the reason he didn't file a motion, for instance, in district court was he was surprised about this informant coming to the surface. The record shows that the government turned over Jesse Starr's grand jury testimony three weeks before trial on August 6th. Trial started – I'm sorry, October 6th. Trial started October 25th. Jesse Starr didn't testify, I believe, until October 29th. So there was plenty of time to react to this information. As far as the information regarding the payment to Jesse Starr for his first and last month's rent and so forth, that was turned over a little later, but in advance of trial and enough time for the defendant to react to this information. So there was no surprise here, and the defendant had a full opportunity to develop the facts of this case during the cross-examination of Jesse Starr himself. So we need to look at that now. And what that shows is Jesse Starr quite clearly said there were no promises made to him by the government except to make his cooperation known to any prosecuting attorney if that became necessary. That's the only consideration. He got no money other than what I've already discussed, and no leniency on any sentence was ever – was ever made. I want to address the legal aspects, even though we think the claim was waived and shouldn't be considered. The defendant considers this structural error. That is a bare conclusion from the fact that he – he draws from the fact that this is a violation of constitutional dimension. But those two don't follow. And if you look, simply because it's a constitutional claim doesn't mean it's automatically structural error. And if you look at this Court's own opinion in Danielson, it rejected that claim, not in so many words, but it said – and that's the case that bears a clear good similarity to the facts of our case, a so-called intrusion into the defense camp. And there this Court said that even if there had been an intrusion, that doesn't equate to an automatic reversal. You still must find – in other words, it's not structural error. You still must find prejudice. And what's the case? I'm sorry. I'm sorry. Danielson. Danielson. And Danielson is important. It actually supports the government, in my view, because in that case, the so-called informant who so allegedly intruded into the defense camp obtained evidence of additional illegal activities beyond what the defendant was then currently charged with, just like in our case. It was tampering, jury tampering, and suborning perjury. And this Court said that it was not a permissible intrusion into the attorney client privilege to develop evidence of additional crimes such as those. That's exactly the case we have here. And Weatherford v. Bursey is also a case where there was an alleged intrusion into the attorney client camp, and the Court similarly found that a showing of prejudice had to be shown. And that leads to my next thing I want to mention on this subject. The Court asked the question, what prejudice is there? There is absolutely no evidence that the defense camp was ever invaded. There is no evidence in the trial that Jesse Starr related any information regarding any strategic discussions. I think what he's relying upon is the fact that he didn't have a receipt. He needed the receipt for the cause. He didn't have it. And he's suggesting at least that that's information that was known and would not have been known. Well, that's what Mr. Reichel argued just moments ago, but there is actually no evidence in the record that that came from Mr. Axep, the defense attorney. The testimony at trial was that the defendant himself told Jesse Starr, I need receipts. I need to prove somehow that I didn't steal these cars. There's no evidence that that was any directive from his attorney. That evidence came later when Mr. Axep was actually testifying at trial and he related the information that he had told Mr. Starr or, I'm sorry, Mr. Waters that this would be crucial to his defense. So there's no evidence that Jesse Starr ever attended any meeting between defense counsel and his client. That right there distinguishes the case from Bercy and from Danielson. There's no evidence that he came into possession of any information of a strategic nature about the defense plans. And even if he did, there's no evidence that that was ever conveyed to the prosecution. So even considered on the merits, this claim can't stand up. Unless the Court has any additional questions regarding the Fifth Amendment claim, I'll move on to some of the other issues. The jury instruction issue, I think the Court has identified the key arguments that I would make here. This is an instruction that was based on the Arthur Anderson case, and I don't think that jury instructions are supposed to help the jury understand their job and what their mission is. And a jury instruction that tells the jury, you must find that the defendant was wicked or evil, I think is just not that helpful. I don't mean to make light of it, but evil and wicked are terms that I associate with the Wizard of Oz or people who fly on broomsticks for a living. It's not something that a jury can easily translate into factual things that they are supposed to find. Consciousness of wrongdoing, now we're in business. That does tell the jury that they have to find that there was some wrongdoing here. And that was exactly the issue in the Arthur Anderson case. Whether the documents that were destroyed in that case were an innocent act as a result of simply following a corporate document retention policy or if they had some more malevolent motive. And that's why that case was reversed, because that was not clear in the jury instruction. And the standard there is abuse of discretion. First of all, this Court has to find that the instruction was correct as a matter of law, and that's a de novo review. But as to the specific formulation of the jury instruction, the specific words used, that's abuse of discretion. And I think the judge did not abuse his discretion in this case. Even if he did, harmless error analysis applies. The defendant hasn't pointed out any reason why he was harmed by this instruction, any specific way in which the jury might have been confused about their duties or what they need to find. Sufficiency of the evidence. I'm sorry. I should talk about Mr. Axep testifying first. Your Honors, in my view, that was a very straightforward application of the crime fraud exception. The crime fraud exception does not require that the attorney be aware that he's being used to facilitate a crime. That was certainly the case here. Mr. Axep did a very innocent act. He asked his client for receipts, and when he got those receipts from the client, he turned it over to the prosecution as reciprocal discovery. The court exercised its proper gatekeeping function. It had Mr. Axep testify out of the presence of the jury first, so that he could determine what he was going to say. And the court prior to that already had the testimony of Ms. Wiltz, who indicated that the receipt was fraudulent. You marry up those two facts, and the judge had everything he needed to find to conclude that the crime fraud exception applied. Sufficiency of the evidence. Your Honor, that's the court obviously has to find that no rational jury could have found the defendant guilty on these facts. I don't think the defendant has come anywhere near that type of proof. And then finally, sentencing. There has to be clear error here. And typically, a court is well within the bounds of reason by denying a two-point reduction for acceptance when the defendant goes to trial. That's not a hard and fast rule. There are rare cases where it can be granted. This is not such a case. This is a case where the defendant not only denied responsibility for this crime right up through sentencing, but he actually challenged, attacked the government witnesses, called them liars. These are just regular people who got drug out to California from Louisiana to testify about something that they had otherwise no, nothing to do with. And he accused them of lying on the stand. He took that right up to the sentencing hearing and then asked the judge to give him two points off for acceptance of responsibility. I don't think anyone would criticize a judge for not going along with that proposition. Unless the Court has any other questions, I would submit it on that. Thank you, Mr. Lapham. Mr. Reichle, you have some time remaining. Thank you, Your Honors. I want to be very clear, and I hope I can clear it up about Mr. Starr. Mr. Starr met with the Mr. Starr began meeting with the FBI in November of 2008. And that's in the record. We didn't know anything about that until the trial started, and here's why. On October 6th, we did get from Mr. Lapham Mr. Starr's prior grand jury testimony, which took place in December of 2009. December of 2009 is when he testified before the grand jury. Nowhere in that grand jury testimony, which is in the record here, did Mr. Starr discuss anything about working as an informant or getting paid or promises of rewards or anything. In that testimony, did he talk about what he had been doing as an agent since November of 2008? In fact, he doesn't mention November of 2008. He testifies in 12 of 09 and says, let me relate some admissions Mr. Waters made about the stolen cars, which he had already been indicted for. So this was a witness brought to a grand jury to talk about something that the defendant was already under indictment for. And secondly, he said, let me tell the grand jury about statements Mr. Waters made about fabricating this receipt in the summer of 09. Mr. Waters was originally indicted for the cars in April of 09, but not indicted, superseding indictment, on the false receipt until sometime in 2010, July of 2010. And we went to trial in October of 2010. So a week, on October 6th, I got his grand jury testimony, which talks about the stolen cars and statements Mr. Waters makes in April of 09 and sometime in the summer of 09. And then I got his, then I got his rap sheet at just the same time. So I knew about when he had court appearances. But shortly before trial commenced, and Mr. Wacken, I hope, would be allowed to come up here again, days before, a day before trial commenced, I got these little cryptic notes which showed he had had meetings with the FBI. They just said meetings with the FBI, meetings with the FBI. That's all I got. What's the point you're trying to make? When Mr. Starr testified then, I asked him about those meetings. And that's when he told me, well, I was there to gather information for them, and that's when I was an agent for them. They told me to keep going in and come back with information. I was going back to relate information. So I really did find this out as he's testifying live. It is my error at the close of the evidence to not make a motion to dismiss the case, the indictment and the charges before the district court. I was in clear error. You don't have to beat yourself too much. It might not have been granted. Well, I think it – I understand, Your Honor. But I think it had to have been granted. Mr. Starr was – On this record? Mr. Starr was – testified that he was – and Mr. Lapham put on the record that he was given approximately $4,500 in relocation fees. They put on the record that he had been – that he understood – this is his testimony – he understood there was a monetary reward at the end of his testimony. And finally, that Mr. – it's in the record that Mr. Lapham was going to assist him with leniency with a pending case. I don't know if that ever happened because that case closed after the trial, I believe. But he was given three different promises, actual payment, a reward, monetary reward, and then leniency. This we found out just the days before trial. But we still didn't know until he testified that he had been inside the defense camp, that he testified he had hired the lawyer, that he was – considered himself an agent, a double agent, as he said. He considered himself part of the prosecution team. And he had stayed throughout. He had stayed throughout. I don't want to waste your time, Mr. Reichelt, but what do we have to find? Let's say that all these things are so. On this record, what was there? What did anybody need to have somebody relay? There has to be some relationship between what you're complaining about and the conviction. And in this case, there's no doubt these cars had been underwater. He testified that once Mr. Waters was indicted, up and through to the trial, he had been working with the FBI and telling them what Mr. Waters was relating, what Mr. Waters' attorney was working on, what was going on in the case. He was inside and he was telling them almost in live time as the case was proceeding to trial. We did not find this out until the days of – the day of trial. We found out – And you must have advised your client that they were still allowing Starr to come in and meet with the defense team. Is that right? That wasn't in the grand jury testimony. And we got the grand jury testimony on October 6th. When you got the grand jury testimony, it was clear that he was going to be a witness. It just – see, I'm asking the question. It's just startling to me that the defense lawyer would allow him in on – when you got the record, you know he's an adverse witness. He didn't come. Does the record show he actually got in on these meetings after you got the grand jury testimony? No, he did not. The record is very clear. If it isn't, we'll make that record. He didn't come in after October 6th. This trial started October 25th. I misunderstood what you just told us then. I'm out of time, I believe. Okay. Thank you very much. Thank you, Mr. Wright. Thank you. Thank counsel for the argument.
judges: Wallace, Farris, Bybee